UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

Leo E. Baerthel,                                    Civil No. 12-1761 (SRN/LIB)

        Plaintiff,

v.                                                  **REPORT AND RECOMMENDATION**

Carolyn W. Colvin, Commissioner of the
Social Security Administration,

        Defendant,

Leo E. Baerthel (Plaintiff) seeks judicial review of the decision of the Commissioner of

Social Security (Defendant) denying his application for disability insurance benefits (DIB).  The

matter was referred to the undersigned United States Magistrate Judge for Report and

Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  This Court has jurisdiction

over the claims pursuant to 42 U.S.C. § 405(g).  Both parties submitted motions for summary

judgment.  For the reasons set forth below, the Court recommends that Plaintiff's motion for

summary judgment be denied and Defendant's motion for summary judgment be granted.

## I.      BACKGROUND

### A.  Procedural History

Plaintiff filed his application for DIB on August 6, 2008,[1] alleging a disability onset date

of July 28, 2008.  (Tr. 111-113).[2]  His application was denied initially and upon reconsideration.

(Tr. 50-57, 65-68).  Upon Plaintiff's request for a hearing, (Tr. 69-70), Administrative Law

Judge Diane Townsend-Anderson (ALJ) held a hearing on August 2, 2010.  (Tr. 26).  The ALJ

---

[1] Plaintiff's application was filed on September 8, 2008; however, he had a protective filing date of August 6, 2008.
(Tr. 160).
[2] Throughout this Report and Recommendation, this Court refers to the administrative record [Docket No. 5] for the
present case by the abbreviation "Tr."

denied Plaintiff's claim on October 14, 2010. (Tr. 18). The ALJ found that from August 6, 2008, through the date of the ALJ's decision, Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 18). Plaintiff sought review of the decision by the ALJ, (Tr. 108-109), and the Appeals Council denied review. (Tr. 1-3). Because the Appeals Council denied Plaintiff's request for review, the ALJ's decision became the final decision of the Commissioner. See 20 C.F.R. §§ 404.981.

**B. Factual History**

Plaintiff was 60 years old at the time that he filed his application. (Tr. 160). He is a high school graduate, he has a driver's license, and served in the United States Army from 1970 to 1972. (Tr. 29). Prior to his alleged disability, he was employed as an estimator for construction projects and as a union organizer. (Tr. 33-34). He lives with his wife and two grandchildren, for whom he provides parenting duties. (Tr. 29). He spends most of his time at home but occasionally attends a play or program at school with his grandchildren. (Tr. 30). He also enjoys using his computer to check email and news articles. (Tr. 30).

At the hearing, Plaintiff stated that he is unable to work because he can't be on his feet for longer than 20 minutes and because he has "issues with sitting for any periods of time." (Tr. 31). He testified that he has "pain in [his] ankles, and in [his] back" and that he suffers from neuropathy in his feet because of his diabetes. (Tr. 32). Plaintiff also testified that "the majority of the pain [comes] from the knees and the back," and he further stated that "if the doctor asked me what the pain level was on a scale of one to ten, I would probably say an eight [or] . . . [e]ight-and-a-half." (Tr. 45). Because of the pain, he has his son come to work in the yard. (Tr. 46). The pain also makes him "a lot more crabbier, . . . hard to deal with sometimes," and makes him not want to get out of bed on certain days. (Tr. 46-47).

He also testified that he makes "about four or five trips a month to doctor's offices and lab tests." He explained that he would go to doctors' appointments for medication changes and pain management. (Tr. 47).

## C. Medical Evidence for the Relevant Time Period

On July 31, 2008, Plaintiff visited Steven Radosevich, M.D., his primary care physician, for a follow-up. (Tr. 294). Dr. Radosevich noted that Plaintiff had diabetes with peripheral neuropathy. (Tr. 294). A foot examination revealed that Plaintiff's feet were warm, with good pulses, and no skin lesions. (Tr. 294). Dr. Radosevich found that Plaintiff's "diabetes has been under good control," although Plaintiff's blood pressure was up that particular day. (Tr. 294).

On August 25, 2008, Plaintiff was seen by Bhavesh M. Patel, M.D., for a follow-up on Plaintiff's hypertension. (Tr. 290). Dr. Patel noted that Plaintiff's "blood pressure ha[d] been under reasonable control" and that Plaintiff's diabetes control was also "good." (Tr. 290-91). Upon examination, Dr. Patel observed Plaintiff's blood pressure to be "134/50 in sitting and 124/52 in standing." (Tr. 291). In light of the normal examination, Dr. Patel advised Plaintiff to continue his blood pressure medications and encouraged him to limit his salt intake and lose some weight. (Tr. 291).

On September 5, 2008, Plaintiff was seen by Dr. Radosevich for a follow-up on his diabetes and atrial fibrillation. Dr. Radosevich noted that Plaintiff's ailments were stable with the support of his medicines and that Plaintiff's "[d]iabtetes ha[d] been well controlled." (Tr. 284). His blood pressure and diabetic control were also stable. (Tr. 284). Plaintiff reported having some metatarsal foot pain, though a foot exam revealed "good pulses, normal-appearing skin," that Plaintiff's feet were warm, but some mild tenderness over the heads of the metatarsal,

mid-foot area. (Tr. 284). Thus, Dr. Radosevich recommended that Plaintiff "followup in Podiatry to see if they feel inserts would be of benefit." (Tr. 284).

On September 9, 2008, Plaintiff was seen by Mark T. Dahl, M.D. for a recheck of his right total knee replacement. (Tr. 275). Plaintiff reported "doing well" and had "marked improvement." (Tr. 275). He continued to engage in more activities and was "working and [] doing more with [the right] knee." (Tr. 275). While his left knee was "bothersome" with some "pain diffusely throughout," he was "not ready for a total" left knee replacement. (Tr. 275). An examination of the left knee noted some limited motion because of pain and mild effusion and swelling; however, he had "good function distally of the lower extremity with good function of his foot and ankle." (Tr. 275). Although he was offered corticosteroids, he refused them and advised that when he was ready, he would proceed with a left total knee replacement. (Tr. 276).

On September 16, 2008, Plaintiff underwent a routine single chamber pacemaker evaluation, which revealed normal results. (Tr. 332). Later pacemaker evaluations likewise returned normal results. (Tr. 374).

On September 29, 2008, at the referral of Dr. Radosevich, Plaintiff was seen by Dr. William Kuglar, DPM, on reports of foot pain. (Tr. 281). Plaintiff had no specific history of injury, and he reported that he had "been trying to walk regularly for exercise." (Tr. 281). Although he had "discomfort [] across the metatarsal area, . . . good cushioned insole[s] to his shoes" were helpful in relieving the discomfort, at least initially. (Tr. 281). Upon examination, Dr. Kuglar, observed "some tenderness across the metatarsal area of both feet, . . . no significant hammertoe deformity," normal skin color and temperature, no tenderness, obvious swelling or erythema, no tenderness dorsally that would be consistent with a stress fracture, no significant callusing, and adequate ankle and subtalar joint range of motion. (Tr. 282). Dr. Kuglar

diagnosed Plaintiff with Metatarsalgia and advised him to find a suitable insert for his shoes, get off his feet and elevate them, whenever possible. (Tr. 282).

In October 2008, Plaintiff made a visit to Dr. Radosevich. (Tr. 397). Dr. Radosevich noted that Plaintiff has found it "very difficult to control high blood pressure" and that he was "on 5 medications." (Tr. 397). His blood pressure that day was in the range of 130-136. (Tr. 397). Dr. Radosevich adjusted Plaintiff's medications and noted that overall Plaintiff was "doing well." (Tr. 397).

On November 18, 2008, Charles T. Grant, M.D., a state agency medical consultant, made a physical residual functional capacity assessment of Plaintiff. (Tr. 355). He found the following exertional limitations: occasionally lifting 20 pounds, frequently lifting 10 pounds, standing or walking (with normal breaks) for a total of about 6 hours in an 8-hour workday, sitting (with normal breaks) for a total of about 6 hours in an 8-hour workday, and no limitation for pushing or pulling other than as noted in the other limitations. (Tr. 356). Under postural limitations, he noted that Plaintiff could frequently climb stairs or ramps, balance, and stoop, and could occasionally kneel, crouch, or crawl. (Tr. 357). Dr. Grant noted no manipulative limitations such as reaching, handling, fingering, or feeling, noted no visual limitations, communicative limitations, or environmental limitations. (Tr. 358-59). On January 30, 2009, state agency medical consultant Dan Larson, M.D., reaffirmed Dr. Grant's assessment. (Tr. 367-69).

In December 2008, Plaintiff again made a visit to Dr. Radosevich with what appeared to be recurrent pneumonia, but Plaintiff was not in acute distress. (Tr. 395). Then, on January 15, 2009, Plaintiff made another follow-up visit with Dr. Radosevich, and while the pneumonia symptoms appeared to subside, Plaintiff reported "shortness of breath both with activity and at

rest." (Tr. 393). Dr. Radosevich noted a normal examination, with good pulse and no abnormalities in Plaintiff's feet. (Tr. 393). However, five days later, on January 20, 2009, Plaintiff visited with Dr. Richard Rose on continued chest pain and shortness of breath. (Tr. 391). Dr. Rose noted that Plaintiff did not have a fever, chills, or cough but stated that Plaintiff had "diabetes, which has not been well controlled." (Tr. 391). Dr. Rose was concerned about what seemed to be "worsening angina, worsening shortness of breath and recommended" that Plaintiff report to the emergency room. (Tr. 391). Upon reporting to the emergency room, Plaintiff underwent two angiograms, an angioplasty during which a stent was inserted, and an upper gastrointestinal endoscopy, in which several polyps were observed. (Tr. 415, 440-41, 446-47, 453-54). On the day of his admittance, the examining physician noted that Plaintiff's most recent hemoglobin "suggest[ed] good control of his diabetes." (Tr. 420). She also noted that Plaintiff's "blood pressure [appeared] suboptimally controlled." (Tr. 420).

On February 4, 2009, Plaintiff made a visit to Dr. Radosevich in which Dr. Radosevich found that Plaintiff no longer suffered from shortness of breath and that Plaintiff was "doing well." (Tr. 389). On February 5, 2009, Plaintiff underwent cardiac rehabilitation. (Tr. 406). Plaintiff noted that he still had some shortness of breath, particularly during activity, as he walked "a few blocks a day for exercise." (Tr. 408). Plaintiff's functional capacity was noted as "average." (Tr. 409). Plaintiff's pain rating was at zero out of ten, and he was able to walk for six minutes without a rest break. (Tr. 409). Plaintiff continued his cardiac rehabilitation throughout February, March, April, and May 2009, which Plaintiff tolerated well and which showed positive results and improvement. (Tr. 480-530, 536-554, 615-642). Plaintiff continually reported exercising 30-45 minutes five to six days per week, which eventually increased to 45-60 minutes, and he reported no pain. (Tr. 493, 497, 501, 504, 513, 528). His

blood pressure response was appropriate with exercise. (Tr. 493, 497, 501). However, beginning on April 16, 2009, before Plaintiff's upcoming left knee surgery, Plaintiff began to report some minor (two out of ten) left knee pain. (Tr. 641); (Tr. 638, 639). Nevertheless, Plaintiff continued his exercises and by April 28, 2009, he again reported no pain. (Tr. 625, 629, 633, 637, 639, 641). On May 7, 2009, he again noted some "mild left knee discomfort" but stated it was "tolerable with exercise," (Tr. 621), but he later again reported no pain. (Tr. 615).

Plaintiff's assessment on May 19, 2009, noted that Plaintiff "denied any cardiovascular symptoms during rehab sessions," that he felt he "made excellent progress while in cardiac rehab," that his "home exercise consists of walking for 30-45 minutes, 6 days/week," and that he planned to continue his home exercise. (Tr. 609). Plaintiff reported "returnin[ing] to previous work, hobbies, and activities of daily living." (Tr. 609). While Plaintiff stated that he typically had a three out of ten left knee pain while exercise, he noted that on the day of the assessment his knee pain was zero. (Tr. 610).

While undergoing his cardiac rehabilitation, on March 4, 2009, Plaintiff underwent another endoscopy during which several polyps were removed. (Tr. 531-35). On March 11, 2009, on a follow-up visit for his diabetes, Plaintiff reported "[p]roblems with blurry distance vision," but no eye pain or dry eyes and stated he had no other ocular concerns. (Tr. 384). Anthony J. Pfaff, M.D., found that Plaintiff's eyes "look[ed] very stable" and advised him to return in one year for a follow-up exam. (Tr. 385).

Also while undergoing his cardiac rehabilitation, on April 6, 2009, Plaintiff reported to Dr. Dahl with pain in his left knee, which he said was becoming "more debilitating to the point where he [was] requesting further surgical intervention." (Tr. 645). On the day of the visit, he rated his pain as an eight out of ten. (Tr. 645). Upon examination, Dr. Dahl noted that Plaintiff

had some "mild neuropathy of the bilateral lower extremities from his diabetes," but "no significant varicosities . . . with no open areas, ecchymosis or erythema." (Tr. 645). Plaintiff's x-rays showed "minimal leg length discrepancy . . . with a well-healed osteotomy with good position of the hardware" and his right total knee replacement was "in good alignment and good position." (Tr. 646). Dr. Dahl spoke with Plaintiff about conservative care, but because Plaintiff felt he had exhausted this option, Dr. Dahl also spoke with Plaintiff regarding a total left knee replacement. (Tr. 646). Later in April, Plaintiff again reported to Dr. Dahl with increasing left knee pain. (Tr. 647).

In April 2009, Plaintiff also received treatment for a toe infection. (Tr. 382). Steven Lucas, M.D., noted that Plaintiff reported some discharge from the toe and that he had "no sensation in his toes." (Tr. 382). Upon examination, Dr. Lucas observed some swelling and dry blood but only prescribed him antibiotics. (Tr. 382). Dr. Lucas also noted that Plaintiff's blood pressure was higher than he would like it to be because he had recently been discontinued from blood pressure pills. (Tr. 382). On April 13, 2009, Plaintiff visited Dr. Radosevich for a follow-up on his foot care. (Tr. 380). Dr. Radosevich again noted that Plaintiff's "diabetes has been under good control." (Tr. 380). However, Plaintiff's blood pressure was elevated on that day. (Tr. 380). Patient's feet were warm, with no areas of breakdown, and Dr. Radosevich observed no swelling or redness of the great toe, which was recently treated for infection. (Tr. 380). Plaintiff also reported that he planned to undergo a left knee replacement on June 9, 2009. (Tr. 380).

On June 23, 2009, Plaintiff underwent a satisfactory total left knee replacement. (Tr. 676-78). Shortly after, Plaintiff underwent additional physical therapy. (Tr. 679-682). He was noted as doing well and he reported his pain between a two and four out of ten, with less pain

when at rest.  (Tr. 679, 681).  In July, Plaintiff was reporting that his pain level was at a two out of ten, that he had no problems or concerns, and that "it [felt] pretty good."  (Tr. 648).  Plaintiff was doing home exercises, he had no pain to palpation, and his "[r]ange of motion [was] acceptable."  (Tr. 648).  He was instructed to continue home exercises, to use ice, and to elevate.  (Tr. 648).  On July 23, 2009, Plaintiff again visited Dr. Dahl regarding his left knee and this time reported his pain level at one out of ten.  (Tr. 650).  Plaintiff reported "feel[ing] pretty good and getting better everyday."  (Tr. 650).  He had no problems or concerns, no new complaints, he was continuing his home exercises and physical therapy.  (Tr. 650).  On a follow-up in September 2009 with Dr. Dahl, Plaintiff reported "marked improvement" in his left knee function and pain compared to pre-operation and also stated he had lost 60 lbs. over the past eight months.  (Tr. 651).  He reported feeling well, walking on a regular basis and "continuing to be more active."  (Tr. 651).  He rated his pain at a one out of ten.  (Tr. 651).  He had no chest pain, no shortness of breath, and no other musculoskeletal concerns.  (Tr. 651).  Upon physical examination, Dr. Dahl noted that Plaintiff's knee was stable and that there were "no changes in [Plaintiff's] neuropathy or distal foot and ankle function."  (Tr. 651).  His "[l]eft total knee replacement [was] doing well."  (Tr. 652).

On November 3, 2009, Plaintiff underwent a spine evaluation in which he stated that he had "been having low back pain off and on for several years with leg pain coming on in the last 6-8 months."  (Tr. 598).  He also reported having some leg pain and balancing issues.  (Tr. 598).  He noted his pain at an eight out of ten at its worst and zero at its best.  (Tr. 598).  Plaintiff reported doing his own yard work but also stated that his son comes over to cut the grass.  (Tr. 598-99).  Plaintiff was directed to use appropriate exercise at home and to engage in physical therapy.  (Tr. 601).  During Plaintiff's physical therapy on November 5, 2009, his physical

therapist, Wendy A. Ebeling, noted that Plaintiff did well and that he tolerated the exercises well. (Tr. 597). The next visit, on November 10, 2009, Plaintiff reported feeling good and was overall tolerating his back soreness. (Tr. 594). On November 20, 2009, Plaintiff reported that his back was "doing well." (Tr. 590). Although Plaintiff still had some loss of balance issues, his back continued to feel well, (Tr. 588-89), and eventually he began to notice improvement in his balance as well. (Tr. 584-85). His physical therapy discharge note provides that although he had some back pain after inadvertently tripping and falling, he reported that his back pain was "gradually getting better again" and that "his balance [had] improved." (Tr. 579). Indeed, his physical therapist noted that "[h]is back pain was much better until he tripped over [a] ball and fell." (Tr. 580).

On January 11, 2010, Plaintiff visited Timinder S. Biring, M.D., for a follow-up to his prior cardiovascular procedures. (Tr. 571-72). Dr. Biring noted that Plaintiff's blood pressure was "slightly elevated when compared to previous" and that Plaintiff's shortness of breath may be related to worsening of his condition from the prior year. (Tr. 572). Dr. Biring recommended a transesophageal echocardiogram. (Tr. 572-76). The results of the test demonstrated "[m]ild cardiac enlargement" but "[n]o significant soft tissue or bony abnormality." (Tr. 561). His left ventricular ejection fraction was 55%. (Tr. 565). On January 18, 2010, Dr. Biring performed an angiography after which he noted that Plaintiff's "[a]ngiogram ha[d] not significantly changed from [his 2009 operation] when directly compared." (Tr. 558). Dr. Biring summarized that Plaintiff had "[n]ormal left ventricular end-diastolic pressure with normal left ventricular systolic function." (Tr. 558). Dr. Biring recommended adding Imdur to Plaintiff's current regimen. (Tr. 558).

In March 2010, Plaintiff visited Robert V. Knowlan, M.D., complaining of left shoulder problems. (Tr. 653). Although Plaintiff stated that his shoulder bothered him at night, he complained of "no associated numbness or tingling" and he did not identify any weakness. (Tr. 653). Dr. Knowlan gave him an injection to alleviate the discomfort and advised him to return if his symptoms persisted. (Tr. 653).

On April 22, 2010, Plaintiff was seen by Dr. Radosevich for a follow-up on his hypertension and diabetes. (Tr. 661). Dr. Radosevich noted that Plaintiff's "blood pressure remain[ed] mildly elevated" and altered Plaintiff's medications slightly. (Tr. 661). On May 11, 2010, Plaintiff underwent a foot examination, which revealed no areas of breakdown and normal results; he was asked to return in eight weeks for a follow-up. (Tr. 660).

On June 2, 2010, Dr. Radosevich completed a residual functional capacity questionnaire to evaluate Plaintiff. (Tr. 683-86). Dr. Radosevich stated that he had been treating Plaintiff four to five times a year since 2005. (Tr. 683). Dr. Radosevich noted that Plaintiff suffered from severe pain in his feet, that Plaintiff's hypertension was uncontrolled despite multiple medications, and that Plaintiff's impairments could be expected to last at least twelve months. (Tr. 683). Dr. Radosevich listed the following functional limitations: 1) Plaintiff could walk two to three city blocks without rest or severe pain; 2) Plaintiff could sit 20 minutes at one time before needing to get up; 3) Plaintiff could stand for 30 minutes at one time before needing to sit down; 4) Plaintiff could sit for about 2 hours and stand for less than 2 hours in an 8-hour work day; 5) Plaintiff must walk 10 minutes every 30 minutes during an 8-hour work day; 6) Plaintiff's job must permit him to shift positions at will from sitting, standing, or walking; 7) Plaintiff would need to take unscheduled breaks during a work day, although Dr. Radosevich did not state how often; and 8) Plaintiff's legs should be elevated at least 75% of the work day. (Tr.

685).  Dr. Radosevich also noted that Plaintiff could never lift more than 20 lbs., could only rarely lift 10 lbs. or more, could rarely twist or stoop, and could never crouch/squat.  (Tr. 686).  In Dr. Radosevich's opinion, Plaintiff would frequently experience attention and concentration issues because of his pain and symptoms, and he could be expected to miss more than four days per month as a result of his impairments or treatment.  (Tr. 683).  However, Dr. Radosevich opined that Plaintiff would be capable of low stress jobs.  (Tr. 686).

At the hearing, a medical expert (ME)[3] provided an opinion that Plaintiff's medical records evidenced the following physical impairments: 1) bilateral knee pain; 2) Type-II diabetes; 3) coronary artery disease; 4) chronic obstructive pulmonary disease and obstructive sleep apnea; 5) low back pain, which the ME presumed to be degenerative disc disease but of which he did not see many imaging studies in the medical records; and 6) left shoulder impingement syndrome, of which there was only one mention in Plaintiff's medical records.  (Tr. 36).  The ME testified that none of these impairments met or equaled any listed impairment.  The ME opined that if Plaintiff was to work, he would be limited to "sedentary level of exertion" and would also be further limited to "only occasional bending, crouching, or stooping . . . no climbing of ladders or scaffolds, exposure to heights, unprotected heights or . . . to hazards, only occasional kneeling or squatting, and no exposure to concentrated levels of humidity or heat or airway irritants."  (Tr. 38).[4]

---

[3] The medical expert is not identified in the transcript of the hearing; however, from the record, it appears that the medical expert was Joseph Horozaniecki, M.D.  (Tr. 10, 99).

[4] Plaintiff also submitted some medical evidence from before his alleged onset disability date.  (Tr. 297-349).  However, Plaintiff does not argue that any of the specific evidence from before the alleged onset disability date undermines the ALJ's conclusion.  Indeed, "[m]edical opinions that predate the alleged onset of disability are of limited relevance."  Carmickle v. Comm'r of Soc. Sec. Admin., 533 F.3d 1155, 1165 (9th Cir. 2008); Herman v. Astrue, 2013 WL 530468, at *2 n.7 (D. S.D. Jan. 8, 2013).  Nonetheless, the Court has reviewed the evidence that predates the alleged onset disability date and finds that it does not undermine the ALJ's decision or any of her conclusions, nor does it demonstrate any significant change in medical condition from that of the relevant medical evidence.

**D. Evidence from the Vocational Expert**

Vocational expert (VE), Robert A. Brezinski,[5] testified at the administrative hearing regarding what jobs exist in the region and whether Plaintiff would be suitable for any such jobs. (Tr. 38-48). The ALJ framed a hypothetical person and asked whether such a person could either perform Plaintiff's past relevant work or some other work available in the economy. The hypothetical person he described was an individual over the age of 60, who

> has high school plus education, and work experience as outlined and modified by [the VE], who is impaired with diabetes with peripheral neuropathy, suffers from atrial fibrillation with pacemaker placement, coronary artery disease with angioplasty and a stent, a left shoulder rotator cuff injury, bilateral osteoarthritic of the knees, and with knee replacement, and he also suffers from COPD and sleep apnea, and is limited to lifting and carrying ten pounds occasionally, five pounds frequently.

(Tr. 39). The hypothetical person would be further limited to work that does not involve "heights, ladders, or scaffolding, exposure to temperature and humidity extremes, or concentrated exposure to any airway irritants" and where it would involve only "occasional bending, stooping, crouching, crawling, twisting and climbing." (Tr. 39). The VE testified that such a person would not be able to perform Plaintiff's past work; however, he stated that such a person could perform certain sedentary work, such as an order taker. (Tr. 39-40).

The ALJ then framed a different hypothetical person: an individual who "would be able to sit a maximum of twenty minutes at any one hour, stand a maximum of thirty minutes at any one hour, could be on one's feet a max of two out of eight, and seated a max of two out of eight." (Tr. 41). The individual would also need to "change position at least every thirty minutes[,] . . . have their legs elevated seventy five percent of the day[,] . . . have use of an assistive device throughout the day." (Tr. 41). Finally, the individual could never crouch or squat, could only

---

[5] The hearing transcript identifies him as Mr. Bruzinsky; however, his professional qualifications and the vocational analysis pages list his full name as Robert A. Brezinski. (See Tr. 101, 224).

rarely stoop or twist, would only be capable of low-stress jobs, and "would be absent from the workplace more than four days a month." (Tr. 42). The VE testified that such a person could not perform any work. (Tr. 42). Indeed, the VE testified that "[s]omeone who misses more than two days of work per month would not be able to retain competitive work." (Tr. 43).

### E. The ALJ's Decision

The ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 18). In reaching her decision, the ALJ purported to apply the required five-step sequential analysis: (1) whether the claimant had engaged in substantial gainful activity; (2) whether the claimant had a severe impairment or a combination of impairments that is "severe"; (3) whether the claimant's impairment(s) met or equaled a listed impairment; (4) whether the claimant had sufficient residual functional capacity (RFC) to return to his past work; and (5) whether the claimant could do other work existing in significant numbers in the regional or national economy. (Tr. 11-12); 20 C.F.R. § 404.1520(a)-(f).

At step one of the analysis, the ALJ determined that Plaintiff had not engaged in substantial work from the onset date of his alleged disability. (Tr. 12). In analyzing step two, the ALJ found that Plaintiff had the following severe impairments: "diabetes mellitus with peripheral neuropathy, bilateral knee osteoarthritis with bilateral knee replacements, chronic obstructive pulmonary disease, obstructive sleep apnea, chronic atrial fibrillation with placement of pacemaker, low back pain, left shoulder impingement, coronary artery disease and congestive heart failure." (Tr. 12).

At step three, relying on the opinion of the ME, the ALJ decided that Plaintiff did not have an impairment or combination of impairments that meet or medically equal one of the listed

impairments in 20 C.F.R., part 404, subpart P, appendix 1. (Tr. 14). Specifically, the ALJ considered the criteria of listings 3.02, 3.10, and 4.04. (Tr. 14).

Then, at step four of the analysis, the ALJ concluded that Plaintiff had the "residual functional capacity to perform sedentary work . . . except that he cannot work at heights or climb ladders or scaffolds, must avoid exposure to temperature extremes and airway irritants, and is limited to occasional bending, crouching, crawling, twisting and climbing." (Tr. 14).

In making this RFC determination, the ALJ employed a two-step process. (Tr. 14-15). First, the ALJ asked whether there was an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms. (Tr. 14). Second, if an underlying physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms was shown, the ALJ evaluated the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limited the claimant's ability to work. (Tr. 14). If objective medical evidence did not substantiate the claimant's statements about intensity, persistence or symptoms, the ALJ made a finding on the credibility of Plaintiff's statements about the limiting effects of his impairments by considering the record as a whole. (Tr. 14). Furthermore, in making her determination, the ALJ considered all of Plaintiff's alleged symptoms and whether they were consistent with the objective medical evidence and other evidence consistent with 20 C.F.R. 404.1529, (Tr. 14), and also considered opinion evidence in accordance with 20 C.F.R. 404.1527. (Tr. 14).

Starting with the first prong of step four, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (Tr. 15). However, at the second prong, the ALJ determined the claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent

that they were inconsistent with the RFC assessment. (Tr. 15). The ALJ explained that "[t]he objective medical evidence [did] not entirely corroborate [Plaintiff's] subjective complaints regarding his limitations." (Tr. 15). Specifically, the ALJ noted that Plaintiff's diabetes was "in good control," and that "[a]ll examinations of [Plaintiff's] feet show[ed] no abnormalities." (Tr. 15). With regard to his knee pain, the ALJ explained that three months after Plaintiff's "left total knee replacement surgery, he reported that he was not taking any pain medication, was walking regularly, did not need to use an assistive device, and had a normal gait on examination." (Tr. 15). The ALJ also noted that Plaintiff "reported improvement in his back pain with physical therapy, and also significant improvement in his balance problems." (Tr. 15).

The ALJ also explained that Plaintiff's "daily activities [were] not entirely consistent with his subjective complaints" because he "testified that he cares for his teenage grandchildren, both of whom have special needs" and because he could "do light household chores, attend some school activities, and play board games and cards." (Tr. 15). The ALJ stated that Plaintiff's "long and steady work record" was a "favorable credibility factor," but noted that Plaintiff "lost his most recent job due to a layoff, not for impairment related reasons." (Tr. 15). Additionally, the ALJ noted that although Plaintiff was taking medication for his neuropathy, he was "not taking any pain medication for his musculoskeletal complaints." (Tr. 15).

With regard to the opinions from the medical experts, the ALJ did not give controlling weight to the opinion of Plaintiff's treating doctor, Dr. Radosevich, that Plaintiff could only "stand and walk less than 2 hours each day, and sit about 2 hours each day, and would miss more than 4 days each month due to [Plaintiff's] symptoms" because "Dr. Radosevich's opinion [was] not corroborated by his examination findings, which uniformly report[ed] no abnormalities on examination of [Plaintiff's] feet, [did] not show any treatment for complaints of low back pain,

indicate[d] good control of [Plaintiff's] diabetes, and only mildly elevated blood pressure." (Tr. 15-16). The ALJ afforded the state agency medical consultant "some weight," as it was supported by examination findings; however, it was not entitled to substantial weight because "it [did] not consider any treatment provided after January 2009." (Tr. 16).

While still under step four of the analysis, the ALJ determined that Plaintiff was not able to perform any past relevant work. (Tr. 16). She found, however, based upon the VE's testimony, that Plaintiff could perform the work of "order taker," given that Plaintiff had "acquired work skills from past relevant work that [were] transferable to other occupations with jobs existing in significant numbers in the national economy." (Tr. 16). Thus, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act. (Tr. 17).

## II.    STANDARD OF REVIEW

Congress imposed standards for determining whether a claimant is entitled to Social Security disability benefits. There are several benefits programs under the Act, including the DIB Program of Title II (42 U.S.C. §§ 401 et seq.). "Disability" means "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To be eligible for benefits, an individual's impairments must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Judicial review of the Commissioner's decision to deny disability benefits is constrained to a determination of whether the decision is supported by substantial evidence in the record as a whole. Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005). Substantial evidence means more

than a scintilla, but less than a preponderance. Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009). The substantial evidence test requires "more than a mere search of the record for evidence supporting the [Commissioner's] findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (alterations in original) (quoting Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987)). Rather, the court "must take into account whatever in the record fairly detracts from its weight." Id. (quoting Universal Camera Corp. v. Nat'l Labor Relations Bd., 340 U.S. 474, 488 (1951)).

When reviewing the record for substantial evidence, the court may not reverse the Commissioner's decision simply because substantial evidence exists to support the opposite conclusion. Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984). Moreover, the Court may not substitute its own judgment or findings of fact for those of the ALJ. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989) (quoting Jackson v. Bowen, 873 F.2d 1111, 1113 (8th Cir. 1989)). After balancing the evidence, if it is possible to reach two inconsistent positions from the evidence and one of those positions represents the Commissioner's decision, the court must affirm the decision. Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). Thus, the court will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008) (quoting Nicola v. Astrue, 480 F.3d 885, 886 (8th Cir. 2007)). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." Id.

## III.    DISCUSSION

Plaintiff raises three distinct issues before the Court: 1) whether the ALJ failed to provide good reasons for discounting the opinion of Plaintiff's treating physician; 2) whether the ALJ failed to fully and fairly develop the record; and 3) whether the ALJ failed to properly evaluate Plaintiff's subjective allegations of pain.  (Pl.'s Br. [Docket No. 7] at 16-30).

### A.  The ALJ provided good reasons for discounting the opinion of Plaintiff's treating physician

Plaintiff argues that the ALJ failed to provide good reasons for discounting Plaintiff's treating physician's opinion and not affording it controlling or substantial weight.  (Pl.'s Br. at 16-22).  The only opinion given by Dr. Radosevich that appears to be at issue is from a June 2, 2010, RFC questionnaire, specifically regarding Plaintiff's ability to stand and sit and how many days Plaintiff was likely to miss from work each month.  (Id. at 18-19); (Tr. 15-16).

Plaintiff relies only on the paragraph in the ALJ's decision specifically discussing the RFC opinion when discussing why he believes the ALJ failed to provide good reasons for discounting the treating physician's opinion.  The Court is not persuaded that focusing on a single paragraph conclusively demonstrates a failure by the ALJ to explain good reasons for not giving controlling weight to a treating physician opinion.  The Court is required to read the ALJ's opinion as a whole, and although a fuller discussion of Plaintiff's treating physician's opinions in this section would have been helpful to the Court, the ALJ's limiting of her specific discussion of the treating physician's RFC opinion to just this one section does not constitute reversible error, in and of itself.  See Lewis-Leavy v. Barnhart, 109 Fed. Appx. 815, at *1 (8th Cir. 2004) (unpublished) ("[R]eading the ALJ's opinion as a whole, we find that he made the requisite findings."); Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999) (explaining that the

Eighth Circuit has "consistently held that a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case"); Carrington v. Astrue, 2008 WL 4462257, at *8 (W.D. Pa. Sept. 29, 2008) (explaining that the Court does not read the ALJ's findings "in a vacuum"). Therefore, in considering whether the ALJ provided good reasons for discounting the RFC opinion of Plaintiff's treating physician, the Court does not merely consider the one paragraph specifically discussing the opinion but also takes into account the ALJ's thorough discussion of the medical evidence in the record and Plaintiff's impairments. (See Tr. 12-13).

Generally, more weight should be given to opinions from treating sources because they are "likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations . . . ." 20 C.F.R. § 416.927(c)(2); Hyland v. Astrue, No. 11-1793 (MJD/AJB), 2012 WL 1392959, at *8 (D. Minn. Apr. 2, 2012). However, "[a] treating physician's opinion 'does not automatically control or obviate the need to evaluate the record as [a] whole.'" Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) (quoting Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001)). When a treating physician's opinions "are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002). Thus, an ALJ may disregard a treating physician's medical opinion, and adopt the consulting physician's contrary opinion, when the treating physician's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the record as a whole. See Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997). If

the treating physician's opinion rests solely on the claimant's complaints and is unsupported by objective medical evidence, the ALJ may appropriately give little weight to such an opinion. Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993). Furthermore, the ALJ can also discount the treating physician's opinion if other assessments are supported by better, or more thorough, medical evidence. Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007); Rogers, 118 F.3d at 602. "It is well established that an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record." Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir. 2000). In other words, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces her otherwise. Wagner, 499 F.3d at 849. "It is the ALJ's function to resolve conflicts among the various treating and examining physicians." Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir. 1995).

Nevertheless, "[w]hether the weight accorded the treating physician's opinion by the ALJ is great or small, the ALJ must give good reasons for that weighting." Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) ("[W]hether the ALJ grants a treating physician's opinion substantial or little weight, the regulations also provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation."). Where an ALJ makes a conclusory statement that a treating physician's opinion is unreliable and unsupported by medical evidence, without any further explanation, it may be a basis to find that the ALJ erred. See Singh, 222 F.3d at 452.

Initially, the Court notes that Plaintiff's challenge is directed to the basis of the reasons provided by the ALJ, rather than the failure to provide reasons for discounting the treating physician's opinion. In other words, Plaintiff does not appear to argue that the ALJ failed to

provide reasons for discounting the treating physician's opinion, but instead, argues that in light of the evidence in the record the reasons the ALJ provided were not "good." Indeed, the only evidence Plaintiff argues the ALJ overlooked was Plaintiff's knee pain. (Pl.'s Br. at 21-22).[6] Contrary to Plaintiff's assertion, however, and reading the ALJ's opinion as a whole, the ALJ specifically referred to and considered Plaintiff's knee pain and treatment throughout the opinion. (Tr. 13, 14, 15). Plaintiff provides no authority that the ALJ was required to specifically discuss Plaintiff's knee issues at every paragraph in the opinion. Thus, reading the ALJ's opinion as a whole, Plaintiff has failed to demonstrate that the ALJ overlooked relevant medical evidence or that she failed to take into account Plaintiff's knee issues and treatment in discounting the opinion of Dr. Radosevich. Moreover, as more fully discussed above in detailing Plaintiff's medical evidence in the record, while Plaintiff presented with some pain in his knees from time to time, his knee replacement surgeries and subsequent physical therapy demonstrated marked improvements and little remaining pain. (Tr. 275, 648, 650-51).

What remains, then, is Plaintiff's challenge to the ALJ's reasons for discounting Dr. Radosevich's opinions. The ALJ, reviewing the medical evidence, found compelling the absence of complications and abnormalities pertaining to Plaintiff's feet and low back pain in Dr. Radosevich's examination findings, and as well as consistent evidence that Plaintiff's diabetes was in good control and his blood pressure was only mildly elevated. (Pl.'s Br. at 20-21); (Tr. 16).

The Court first notes that it is the ALJ's responsibility to determine Plaintiff's residual functional capacity, and an opinion from Plaintiff's treating physician regarding Plaintiff's residual functional capacity is not binding on the Commissioner. See Jones v. Astrue, 619 F.3d

---

[6] Defendant also treated Plaintiff's argument as one that "although the ALJ gave 'several' reasons for discounting Dr. Radosevich's opinion, none of [them] was a 'good' reason," and framed the argument as one depending on whether substantial evidence supported the ALJ's decision. (Def.'s Mem. in Supp. of Mot. [Docket No. 10] at 8).

963, 971 (8th Cir. 2010) ("It is the ALJ's responsibility to determine claimant's RFC based on all

the relevant evidence, including medical records, observations of treating physicians and others,

and claimant's own description of her limitations." (quoting Page v. Astrue, 484 F.3d 1040, 1043

(8th Cir. 2007)); Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) ("[A]lthough medical

source opinions are considered in assessing RFC, the final determination of RFC is left to the

Commissioner.").  Here, in providing an RFC opinion, while Dr. Radosevich checked-off boxes

regarding Plaintiff's functional limitations, he did not state which specific physical impairments

he believed resulted in or contributed to such limitations.  (Tr. 683-86).  In such instances, the

ALJ may discount the opinion.  See Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010);

Casey v. Astrue, 503 F.3d 687, 692 (8th Cir. 2007) (holding that the ALJ appropriately did not

credit the plaintiff's treating physician's RFC questionnaire because it was conclusory and

"simply discussed his ultimate conclusions"); Bliss v. Astrue, 2011 WL 4497870, at *2 (W.D.

Mo. Sept. 27, 2011) ("[A]n ALJ may discount a checklist form completed by a treating physician

when the checklist "cites no medical evidence" or "provides little to no elaboration." (quoting

Wildman)); Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996) ("A treating physician's opinion

deserves no greater respect than any other physician's opinion when the treating physician's

opinion consists of nothing more than vague, conclusory statements.").  Additionally, Plaintiff

has not cited to, and the Court has not found anywhere in the medical record, instances in which

Dr. Radosevich or any other treating doctor imposed the same extent of functional limitations

upon Plaintiff as those found in Dr. Radosevich's June 2010 RFC assessment.  See Hogan, 239

F.3d at 961 (8th Cir. 2001) (discounting the treating physician's opinion regarding the plaintiff's

functional limitations where "[n]one of th[o]se restrictions appear[ed] elsewhere in his treatment

records").  To the contrary, in April 2008, shortly before Plaintiff's alleged onset disability date,

Dr. Radosevich noted that Plaintiff "was given an okay to return to work with no restrictions" and that Dr. Radosevich believed it would be "difficult" for Plaintiff to seek disability. (Tr. 305-06). Furthermore, the only severe impairments Dr. Radosevich listed were Plaintiff's hypertension and severe pain in his feet, which as more fully explained below, and in the Court's prior discussion of Plaintiff's medical evidence in the record, were inconsistent with even Dr. Radosevich's continued findings of only non-severe pain in Plaintiff's feet and mild elevation at times in Plaintiff's blood pressure. Regardless, the Court considers each of the reasons stated by the ALJ.

With regard to the ALJ's conclusion that Dr. Radosevich's examination findings "uniformly report[ed] no abnormalities on examination of [Plaintiff's] feet," there is substantial medical evidence in the record that supports the ALJ's conclusion and reason for discounting Dr. Radosevich's opinion. (Tr. 16). While Plaintiff's medical records evidence that Plaintiff's feet were continually monitored, the record overwhelming supports the ALJ's conclusion that there were no abnormalities or major problems or issues with Plaintiff's feet. To the contrary, Plaintiff's feet, with the exception of a one-time toe infection, were always warm, provided good pulses, and no discoloration. (Tr. 281-82, 284, 294, 393, 380, 651, 660). Contrary to Plaintiff's assertion in his brief, (Pl.'s Br. at 19), the examination of Plaintiff's feet that Plaintiff appears to refer to did not evidence any skin breakdown. (See Tr. 294) (stating "Feet have areas of breakdown: no"). Similarly, Plaintiff's record citations to references of foot pain primarily consisted of the reference of foot pain in the state agency medical evaluations, which were merely noting the existence of some foot pain in the medical records. (See Tr. 352, 363, 367, 370).

Similarly, the ALJ's conclusion that Dr. Radosevich's examination findings "do not show any treatment for complaints of low back pain" is supported by the record as a whole. (Tr. 16). Plaintiff's one sentence argument that "[t]he record as a whole shows significant treatment for back pain" cites only to a span of a little more than a month in which Plaintiff underwent some physical therpary for back pain. (See Tr. 579-98). During this relatively short timeframe, and during his physical therapy, Plaintiff performed well and tolerated the exercises well. (Tr. 594, 597). Indeed, he continually made improvements. (Tr. 579-80, 584-85). Furthermore, there is no other evidence that Plaintiff sought or underwent treatment for his back after he underwent physical therapy in November and December 2009. Moreover, the ALJ's statement pertained to the lack of Dr. Radosevich's examination findings regarding back problems, of which Plaintiff has not cited to any in the medical record before the Court.

Finally, the ALJ's conclusions that Plaintiff's diabetes was in good control and that Plaintiff had only mildly elevated blood pressure are also supported by substantial medical evidence in the record. (Tr. 16). Dr. Radosevich himself, as well as other physicians, noted that Plaintiff's diabetes was in control and stable on numerous occasions. (Tr. 284, 291, 294, 380, 397, 420). Even Plaintiff noted in his disability report that his diabetes was controlled by medication. (Tr. 164). The medical evidence also provides, including Dr. Radosevich's conclusion at times, that Plaintiff's blood pressure was stable and under control. (Tr. 284, 290, 420). His blood pressure during his extensive cardiac rehabilitation, which included regular exercises, was continually "appropriate." (Tr. 493, 497, 501). While the record also indicates instances in which Plaintiff's blood pressure was "mildly" elevated (Tr. 661), and on one occasion where Dr. Radosevich stated it was difficult to control (Tr. 397), the ALJ did not conclude that Plaintiff's blood pressure was always in good control, but rather, acknowledged

that the record evidence demonstrated that Plaintiff had "only mildly elevated blood pressure." (Tr. 16).

For the reasons stated above the Court finds that the ALJ provided good reasons for discounting the RFC opinion of Plaintiff's treating physician. See Patrick v. Comm'r of Soc. Sec., No. 10-780 (DSD/LIB), 2011 WL 821385, at *8-9 (D. Minn. Jan. 26, 2011) (finding that the ALJ appropriately relied on the opinion of the medical expert and "properly discounted the opinion of Plaintiff's treating physician" opining that Plaintiff could only "sit four hours a day and would miss four days of work a month" because it was not based on objective evidence and only made reference, without a good explanation, to the plaintiff's diabetes, which was controlled as evidenced by substantial evidence in the record), adopted, 2011 WL 821373 (D. Minn. Mar. 2, 2011).

### B. The ALJ did not need to further develop the medical record[7]

Plaintiff argues that because the ALJ "rejected Dr. Radosevich's opinions, [he] should have ordered a consultative evaluation." (Pl.'s Br. at 24).

Generally, it is Plaintiff's burden to provide medical evidence demonstrating that Plaintiff is disabled. See 20 C.F.R. §§ 404.1512, 416.912. While "[i]t is true that an ALJ has a duty to develop the record fully," she need only do so when the record as a whole does not allow her to make an informed decision. Haley v. Massanari, 258 F.3d 742, 749 (8th Cir. 2001); Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004) ("The ALJ is required to recontact medical sources and may order consultative evaluations **only if** the available evidence does not provide an adequate basis for determining the merits of the disability claim." (emphasis added)). And even where an ALJ discounts a treating physician's opinion and does not afford it controlling weight,

---

[7] The Court notes that Plaintiff's section heading refers to the ALJ's failure to "obtain work-related mental limitations from a treating or examining medical source," but Plaintiff makes no other reference, nor has the Court found any in the record, regarding Plaintiff's mental limitations.

so long as the record as a whole supports the ALJ's decision, there is no need to order a consultative examination. See Bliss, 2011 WL 4497870, at *4. Here, the ALJ did not reject or entirely discount the opinion of Plaintiff's treating physician, but only refused to give it controlling or substantial weight.[8] The ALJ also adopted the opinion of the medical expert (ME), finding it to be well supported by the record. "It is the ALJ's function to resolve conflicts among the various treating and examining physicians." Bentley, 52 F.3d at 785. "Residual functional capacity assessments by non-treating physicians can constitute the requisite substantial evidence." Smallwood v. Charter, 65 F.3d 87, 89 (8th Cir. 1995) (holding that when an ALJ is "faced with a conclusory opinion by a treating physician, the Commissioner need only come forth with 'some medical evidence' that the claimant can work" (quoting Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir. 1995)). Although "the opinion of a non-treating, non-examining physician, standing alone, cannot constitute substantial evidence, . . . when the opinion is one aspect of a record from which the ALJ draws his conclusions and which substantially supports his findings, no error occurs." Johnson v. Astrue, No. 10-4373 (DWF/JJG), 2011 WL 7615112, at *15 (D. Minn. Dec. 15, 2011), adopted, 2012 WL 1004992 (D. Minn. Mar. 26, 2012). Indeed, this Court has previously explained that "if the ALJ did not rely solely on the nonexamining physician's opinion but also conducted an independent review of the medical evidence and other evidence, such as motivation to return to work and daily activities, then there is substantial evidence in the record to support the ALJ's RFC determination." Phillips v. Astrue, No. 10-3069 (MJD/LIB), 2011 WL 6960970, at *14 (D. Minn. Dec. 5, 2011) (citing Krogmeier, 294 F.3d at 1024), adopted, 2012 WL 32949 (D. Minn. Jan. 6, 2012); Anderson v Shalala, 51 F.3d 777, 779

---

[8] Indeed, even if the ALJ had adopted the opinion of Dr. Radosevich with regard to Plaintiff's functional limitations, with the exception of the limitations regarding low-stress and the number of days that Plaintiff would be required to miss from work, the vocational expert testified that they would still allow Plaintiff to perform the job of an order taker. (Tr. 42).

(8th Cir. 1995) ("Although it is true that the opinion of a reviewing physician alone does not constitute substantial evidence . . . the ALJ did not rely solely on the reviewing physicians in this case. The ALJ also conducted an independent analysis of the medical evidence.").

The Court finds that the ALJ adequately analyzed and weighed the various medical expert opinions in the record and the medical record as a whole. Thus, the ALJ was not required to order a consultative evaluation. See Patrick, 2011 WL 821385, at *8-9 (finding that the ALJ appropriately relied on the opinion of the medical expert, properly discounted the opinion of the plaintiff's treating physician, and had no further duty to develop the record); Bliss, 2011 WL 4497870, at *2-3 (finding that the ALJ appropriately discredited two of the plaintiff's treating physician's opinions regarding how much time he would miss from work and how much time he needed to rest or switch positions in a fifteen minute interval because the opinions were not supported by clinical or laboratory findings and further holding that the "ALJ did not err in failing to order a consultative examination after not assigning controlling weight to the treating physician's opinion"); Lundgren v. Astrue, No. 09-3395 (RHK/LIB), 2011 WL 882084, at *15 (D. Minn. Feb. 7, 2011) (holding that the ALJ's "thorough review of the evidence of record in reaching his decision . . . provided ample basis for assessing [the plaintiff's] functional limitations in the workplace," after finding that the ALJ's decision to not "give controlling weight to the opinion of [the plaintiff's treating physician] was not erroneous"), adopted, 2011 WL 883094 (D. Minn. Mar. 11, 2011).[9]

---

[9] Additionally, the Court will not remand an ALJ's decision for failure to develop the record "absent unfairness or prejudice." Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993); Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995). Here, Plaintiff, who is represented by counsel now and who was represented by counsel at the hearing, has not demonstrated or argued any unfairness or prejudice. Moreover, as noted above, even if the ALJ had adopted the functional limitations, except for those related to low-stress and how much time Plaintiff would miss per month, it would not have changed the vocational expert's opinion that Plaintiff could perform the work of order taker.

**C. The ALJ did not err in his credibility analysis**

When analyzing a claimant's subjective complaints, the ALJ must consider the following credibility factors: 1) daily activities; 2) duration, frequency and intensity of pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). However, the "ALJ need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). Furthermore, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003). Courts should defer to the ALJ's credibility findings when the ALJ gives good reasons that are supported by substantial evidence. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005) (citing Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003)).

The ALJ may not discount a claimant's credibility solely because the objective evidence does not fully support his subjective complaints, but may discount credibility based on inconsistencies in the record as a whole. Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005). The ALJ is expected to "detail the reasons for discrediting the testimony and set forth the inconsistencies found." Guilliams, 393 F.3d at 802 (quoting Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003)).

Here, the ALJ outlined in detail, with specific citations to the record, the bases for discrediting Plaintiff's credibility regarding his subjective allegations of pain. (Tr. 15). The ALJ relied on numerous instances in the record in which Plaintiff reported not taking pain medication, walking regularly, not using an assistive device, improvement in his balance and pain with physical therapy (particularly after surgery) and Plaintiff's ability to exercise effectively after rehabilitation. (Tr. 15, 275, 648, 650-51). Additionally, Plaintiff's self-reported low pain levels

throughout medical records of his treatments was not consistent with Plaintiff's testimony at the hearing that his pain was at an eight or eight-and-a-half every day. (Tr. 45-46). While Plaintiff points out that an ALJ may not discount subjective complaints of pain solely on lack of objective medical evidence, where the medical evidence is consistently contrary to Plaintiff's testimony regarding pain, the Court can accept the ALJ's credibility determination. Russell v. Sullivan, 950 F.2d 542, 546 (8th Cir. 1991).

The ALJ also took into account Plaintiff's daily activities, which consisted of providing care for two teenage grandchildren with special needs, doing light household chores, and engaging in other activities. (Tr. 15). Plaintiff himself had admitted on numerous instances to being "fairly active." (See, e.g., Tr. 438). Indeed, Dr. Radosevich himself noted in an April 2008 examination, shortly before Plaintiff's alleged onset disability date, that Plaintiff "was given an okay to return to work with no restrictions." (Tr. 305-06). The Court also takes note of Plaintiff's extensive cardiac rehabilitation exercises during which he reported almost no pain whatsoever in repeated and continuous exercises for an extend period of time. (Tr. 480-530, 536-554, 615-642). Furthermore, the ALJ noted that contrary to the Plaintiff's claim of disability, he "lost his most recent job due to a layoff, not for impairment related reasons." (Tr. 15, 165). Finally, the ALJ noted that Plaintiff did not report side effects from his medication and was not taking "any medication for his musculoskeletal complaints." (Tr. 15).

Although Plaintiff had been hospitalized on several instances related to a bout with pneumonia, replacement knee surgeries, and an insertion of a stent into his artery, the medical record shows that Plaintiff continually made improvements after successful treatments, and he was able to effectively return to exercise and continue his daily activities. His medical record does not evidence ongoing reports of substantial pain, but rather, only isolated reports of

significant pain on a few instances immediately prior to his hospitalization for the stent and knee

replacements, after each of which his pain subsided.  Moreover, even Dr. Radosevich's

conclusory RFC emphasized severity only regarding Plaintiff's hypertension and foot pain,

whereas Plaintiff's testimony at the hearing contrarily emphasized significant pain from his

knees and back.  More to the point, the medical records do not document even Plaintiff's

subjective reports of pain, nearly as high as Plaintiff claimed his pain level to be at the hearing

before the ALJ.

On the whole, the Court finds that the ALJ properly evaluated, and noted, the

inconsistencies in the record that called into question Plaintiff's credibility with regard to his

pain.  "Because the ALJ gave good reasons for discounting [Plaintiff's] credibility, we defer to

the ALJ's credibility findings."  Renstrom v. Astrue, 680 F.3d 1057, 1067 (8th Cir. 2012).

## IV.    CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

1)  Defendant's Motion for Summary Judgment [Docket No. 9] be **GRANTED**;

2)  Plaintiff's Motion for Summary Judgment [Docket No. 6] be **DENIED;** and

3)  Judgment be entered accordingly.


Dated: August 2, 2013                                    s/Leo I. Brisbois
                                                         LEO I. BRISBOIS
                                                         United States Magistrate Judge


## N O T I C E

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation
by filing with the Clerk of Court, and serving all parties **by August 16, 2013**, a writing that
specifically identifies the portions of the Report to which objections are made and the bases for

each objection. A party may respond to the objections within fourteen days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.